UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

DORIS ROLLINS *next of kin of*        )
LARRY DALE BYFORD,                    )
                                      )
        *Plaintiff,*                  )
                                      )        No. 4:10-cv-78
v.                                    )
                                      )        Judge Mattice
DONNA DELRIO, *individually and in her* )
*official capacity*, and BEDFORD COUNTY, )
TENNESSEE,                            )
                                      )
        *Defendants.*                 )

## MEMORANDUM AND ORDER

Before the Court are Defendants' Motion for Summary Judgment [Court Doc. 30];

Motion Strike [sic] Dr. Shackelford's Testimony and the Affidavits of Michael Throneberry

and Allen Walsh [Court Doc. 40]; and Motion to Strike Certain Responses to Defendants'

Statement of Undisputed Facts [Court Doc. 42]. Having received and considered all the

responsive briefing and for the reasons explained below, Defendants' Motion for Summary

Judgment [Court Doc. 30]; Motion Strike Dr. Shackelford's Testimony and the Affidavits of

Michael Throneberry and Allen Walsh [Court Doc. 40]; and Motion to Strike Certain

Responses to Defendants' Statement of Undisputed Facts [Court Doc. 42] will be **DENIED**.

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment

– and the Court to grant summary judgment – "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of

material facts must support its position by "citing to . . . materials in the record, including

depositions, documents, . . . affidavits or declarations . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may bear this burden by either producing evidence that demonstrates the absence of a genuine issue of material fact, or by simply "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. To refute such a showing, the nonmoving party may not simply rest on its pleadings. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *see Anderson*, 477 U.S. at 249. The nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Celotex*, 477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson*, 477

U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Anderson*, 477 U.S. at 254. Thus, if the plaintiff must ultimately prove his case at trial by a preponderance of the evidence, the Court must, on a motion for summary judgment, determine whether a jury could reasonably find by a preponderance of the evidence that the plaintiff's factual contentions are true. *See id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.     BACKGROUND

### A.     Factual Background

As discussed below in significantly more detail, this Court has already made clear that it does not find Statements of Undisputed Material Facts useful and that "they will not henceforth be considered in conjunction with a Motion for Summary Judgment in this case or any other." *Cross v. Sbarro Am., Inc.*, 1:09-cv-275, Court Doc. 80, 7-8 (E.D. Tenn. Feb. 15, 2011). Further, the parties' sole reliance on their Statements of Undisputed Material Facts in their briefing of the (un)disputed material facts has rendered the Court's job on Defendants' Motion for Summary Judgment significantly more difficult given the repeated inconsistencies, also discussed in more detail below, between certain of the statements

– which apparently were not verified by the other party and simply "Admitted" – and the actual records upon which they purport to be based. The Court was prepared to discount the first error it noted – about Dr. Rupard's changes to Byford's prescriptions – as a one-time error, even if on one of the central issues of the case, if not for the fact that the Court subsequently discovered that both parties' Statements of Undisputed and Material Facts are riddled with errors – typographical, factual, and otherwise.

As noted in the *Cross* opinion, and as this case has once again demonstrated, not only is the practice of filing statements of undisputed and material facts needlessly duplicative – as the Court still has to verify the materials are as stated – and cumbersome – as it allows the parties to file wildly lengthy briefing in these matters – but it is also devoid of the purported benefits of such a method of filing, as several of the statements of "fact" are written in an argumentative manner or appear to be based on opinions, as the parties' dueling responses indicate a significant lack of agreement over those "undisputed facts," and as the parties appear to devote their time and effort to bickering over the phrasing of the "undisputed" statements of "facts," rather than verifying the accuracy of the information contained in the statements.

For its own ease of reference, the Court attempted to construct an agreed-upon timeline below using the parties' Responses – where they evinced agreement – to each others' Statements of Undisputed and Material Facts [Court Docs. 36, Pl.'s Respon. to Defs.' SUMF; Court Doc. 44, Defs.' Respon. to Pl.'s SUMF]. But given the volume of information incorporated into the parties briefing on the Motion for Summary Judgment and the Statements of Material Facts – totaling over 1000 pages in length, exclusive of the accompanying Motions to Strike and their briefing – and the Court's difficulty in verifying

-4-

the accuracy of the facts contained in the Statements, both admitted and not, the Court is even more certain that summary judgment is simply not appropriate at this juncture.

Below is a timeline of the largely agreed-upon events surrounding Byford's incarceration and death:

Mon. 10/01/09: At 7:00 p.m., Byford (the decedent in this action) checks in to the Bedford County Workhouse ("BCW") to serve a 45-day sentence for driving on a revoked driver's license, and brings with him certain medications, including Enulose, potassium pills ("Klor-Con MZD"), Furosemide ("Lasix"), and nonsteroidal pain medication ("Diclofenac"). As recorded on the Inmate Medical Form, he appeared "under the influence of alcohol or drugs," "normal," "alert/oriented," "slurred speech," "unsteady gait," "balance problem," "limp," was "currently sick and/or injured," and "has fluid bildup, heart disease, [and] can't climb." (Defs.' Respon. to Pl.'s SUMF ¶ 1; Pl.'s Respon. to Defs.' SUMF ¶ 29; Court Doc. 35-4, #815-16[1], Inmate Med. Form.)

Tues. 10/03/09: At 8:02 p.m., Dorm H calls about Byford and Sgt. Carroll checks on him. Nurse Delrio is notified of his condition and advises telling Byford to elevate his feet and giving him another potassium pill; reports that she will be in the next day. (Defs.' Respon. to Pl.'s SUMF ¶ 26.)

Wed. 10/04/09: Byford submits his first medical request form, describing difficulty urinating and swelling in his legs and feet. (Pl.'s Respon. to Defs.' SUMF ¶ 37.)

Thur. 10/05/09: Byford sees Nurse Delrio and Dr. Rupard – who both served as the medical doctor at BCW and who, separately and outside BCW, was Byford's primary care physician – for the first time during his jail stay. First he meets with Nurse Delrio, who takes his blood pressure, checks his medications, and arranges an appointment with Dr. Rupard. Off. Prince takes him to his appointment, during which Dr. Rupard diagnoses exacerbation of his preexisitng congestive heart failure and orders that his Lasix dosage be increased from 40 mgs

---

[1] Because of the large volume of exhibits, the manner in which they were uploaded to the Court's electronic filing system, and the multiple and varying page identifiers, all references to documents herein will be made to the Court-assigned "PageID" number, signified by the Court's use of the # symbol.

two times daily to 80 mgs in the morning and 40 mgs in the evening[2] to help get rid of the excess fluid, that he be weighed every Monday, Wednesday, and Friday, and that Byford elevate his feet whenever possible. Finally, Dr. Rupard orders Byford to return to see him in eight days for a followup visit.(Defs.' Respon. to Pl.'s SUMF ¶¶ 2, 28; Pl.'s Respon. to Defs.' SUMF ¶¶ 46, 51-53.)

Fri. 10/06/09:   Nurse Delrio arrives at BCW at 4:59 p.m. and leaves at 5:11 p.m. (Defs.' Respon. to Pl.'s SUMF ¶ 29.)

Sat. 10/07/09:   As reported by Sgt. Carroll and relayed by him to Nurse Delrio, Byford does not feel well, is lightheaded and pale, and has swollen feet. (Pl.'s Respon. to Defs.' SUMF ¶ 56.) BCW staff calls Nurse Delrio, but cannot reach her at first and could not leave a message, as her county-issued phone did not have voicemail that worked. When they do reach her, she advises them to ensure that Byford's feet were elevated and to bring him an extra mattress. (Pl.'s Respon. to Defs.' SUMF ¶¶ 9, 56; Defs.' Respon. to Pl.'s SUMF ¶ 24(C), 30.)

Sun. 10/08/09:   At 2:27 a.m., Dorm H reports that Byford is coughing and unable to sleep, and he is moved to medical watch.[3] Nurse Delrio is called at 6:22 a.m. about Byford and states she will be in at 8:00 or 9:00 a.m. to check on him.

At 10:57 a.m., Byford throws up in his cell. Nurse Delrio is called about Byford again, says she will be down there "in a few," and arrives to visit Byford at 11:48 a.m. (Pl.'s Respon. to Defs.' SUMF ¶¶ 60-61; Defs.' Respon. to Pl.'s SUMF ¶¶ 31-34.)

Mon. 10/12/09:   Sgt. Edwards is dispatched to check on Byford, because he is

---

[2] Defendants' Statement of Undisputed and Material facts says "Dr. Rupard diagnosed Mr. Byford with an exacerbation of his congestive heart failure and increased his morning Lasix from 20 mg to 40 mg," and Plaintiff's Response simply states "Admitted." (Pl.'s Respon. to Defs.' SUMF ¶ 50.) But the material upon which that statement purports to be based – Dr. Rupard's deposition testimony – clearly reveals a different "undisputed and material fact": "increase Lasix 40 BID to 80 in the morning, continue 40 in the evening. Elevate the feet when possible. I need to recheck in eight days at sick call." (Court Doc. 30-4, Rupard Dep., #523, 84:2-6.) Further, although Plaintiff just wrote a summary "Admitted," her own SUMF reflects the accurate amounts. (Pl.'s SUMF ¶ 2.)

[3] Byford's transfer to Medical Watch is an important – but disputed – part of the story. Defendants' SUMF states that "[Delrio] was called early that Monday [October 5th, 2009] morning (about 4 or 5 a.m.) and informed that Byford had some swelling in his face. Delrio told the guards to move Byford to medical watch, which is right across from the guard station and is video monitored." (Defs.' SUMF ¶¶ 39-41.) But, as Plaintiff notes in disputing her version of events, BCW Jail Shift Report ("JSR") records indicate that Byford was not moved to Medical Watch until October 8 at 2:27 a.m., after Dorm-H reported that Byford was coughing and could not sleep. (Pl.'s Respon. to Defs.' SUMF ¶ 10The same

-6-

beating on the wall or window of his cell, signaling that he wants something. Nurse Delrio arrives at the jail at 4:10 p.m. and leaves at 5:00 p.m. (Pl.'s Respon. to Defs.' SUMF ¶ 62; Pl.'s SUMF ¶ 35.)

Tues. 10/13/09:   At 1:25 a.m., Byford falls on the floor trying to use his toilet while on medical watch and defecates on himself and the floor. Sgt. Arnold and Off. Cooper check on Byford, and, upon finding no injuries, clean him up and return him to his cell. Agt. Cooper asked Byford if he was ok, and he states he is fine. He has had diarrhea for several days before this fall, which Nurse Delrio ordered to be treated with Milk of Magnesia.

This incident prompts Sgt. Arnold to write the following note to Lokey, who passes it along to Nurse Delrio[4]:

> [Byford] can't use the restroom or shower by his self. He's getting where he can't even move at all. He doesn't seem to be eating much and he does #2 "a lot" We all agree he is getting worse. He may need to be looked over "real" good again. I'm thinking he may end up getting hurt in there. He did ask to see the nurse again. Also he stayed up all night yelling, we asked him what he needed and he stated he didn't know. Got multiple complaints from A-Dorm keeps other lockdown people awake. He hasn't slept even an hour since we been on. He ~~may~~ need some "depends" (man diapers)

Five hours later, at 6:41 a.m., Sgt. Edwards is dispatched to check on Byford because he is "shaking."

Nurse Delrio arrives at BCW sometime between 3:30 and 3:50 p.m. and leaves at 4:28 p.m.[5]

---

[4]  Whether she actually received the note is disputed. (Pl.'s Respon. to Defs.' SUMF ¶ 74.)

[5]  This is another example of an apparent discrepancy between the SUMF and the material upon which it purports to be based, unchallenged by Defendants. Plaintiff's SUMF says "According to 10-13-09 Jail Shift Report at 15:41 Nurse Donna in. 16:18 Nurse Donna in. 17:10 Nurse Donna out," and Defendants simply respond "Admitted." (Defs.' Respon. to Pl.'s SUMF, ¶ 41.)

Consulting the source, though, reveals that the Jail Shift Report seems to be organized such that the identifying information for each entry – date, time, officer Id, shift, and dept – appears before each entry, and thus that it actually reads that on 10/13/2009 at 15:38 "NURSE DONNA IN," at 15:56 "OFFICER SMITH TO FEED LOCKDOWN; NURSE DONNA IN," and at 16:28 "NURSE DONNA OUT." (Court Doc. 35-6, Part 3 of the Exs. to the Lokey Dep., #907-08.)

At 9:55 p.m., Byford does not have any of his evening medications. Nurse Delrio is called, and she directs Sgt. Arnold to give him his other medications – enulose and hydrozine – and says that he would be fine until she came back to BCW in the morning. (Pl.'s Respon. to Defs.' SUMF ¶¶ 64, 67-68, 71; Defs.' Respon. to Pl.'s SUMF ¶¶ 37-38, 42; Court Doc. 30-9, Ex. 1 to Delrio Dep., Records Provided by Bedford Cnty. Jail Larry Dale Byford, #622-23 ("Arnold Note") (strikethrough in original).)

Wed. 10/14/09:    Nurse Delrio arrives at BCW at 4:14 p.m. and leaves at 4:40 p.m. At 9:00 p.m., Byford is out of hydrozine. Nurse Delrio is called and says she would check on it the next day. (JSR #898; Defs.' Respon. to Pl.'s SUMF ¶ 43.)

Thur. 10/15/09:    At 2:45 a.m., Byford again falls on the floor his cell and injures his arm. Sgt. Arnold cleans and bandages his arm and reports that Byford says he is fine and does not need further medical attention. Nurse Delrio arrives at BCW at 4:14 p.m. and leaves at 4:40 p.m. When she sees Byford during that time, she makes the decision not to send him to the hospital. (Pl.'s Respon. to Defs.' SUMF ¶¶ 10, 85-87.)

Fri. 10/16/09:    Plaintiff reports speaking with Byford, her brother, by telephone on this date (and others during his incarceration, although she cannot remember the dates of those conversations). During this conversation, Byford told Plaintiff he had been passing blood rectally and w"as still real weak[ ] and swollen." Plaintiff attempted to visit Byford, but was told by Ann Eley that her appointment was not until the following Friday – a week from that day – and thus she was not allowed to see him, although Eley did check to see if an exception could be made. Byford's account shows that he was charged for a doctor's call and receiving over-the-counter medications on this day (and this day alone).[6] (Defs.' Respon. to Pl.'s SUMF ¶ ¶ 9, 15, 23.)

---

Therefore, Plaintiff's SUMF, as endorsed by Defendants, would have the Court believe that the JSR reflects that Nurse Delrio arrived at 3:41 p.m. and then again at 4:18 p.m. and then leaves at 5:10 p.m., whereas the actual report seems to say that she arrived at 3:38 p.m. and again 3:56 p.m., and left at 4:56 p.m. Given the significant emphasis Plaintiff has repeatedly placed on the records, it is incumbent upon them to represent them accurately, and given how argumentative but unsubstantive some of Defendants' responses to those statements are, it is incumbent upon them actually to verify the information when "admitt[ing]" it.

[6] Defendants deny Plaintiff's statement that "According to Sgt. Ann Eley, every time an inmate is seen by a nurse, they are charged. Larry Byford was only charged for seeing nurse once on October 16, 2009. (Ann Eley depo., Ex. 1)." on the grounds that "There are no exhibits to Ann Eley's deposition." (Defs.' Respon. to Pl.'s SUMF ¶ 23.) But, the Eley Deposition excerpt submited as an exhibit [Court Doc. 35-8] to Plaintiff's Response to Defendant's Motion for Summary Judgment clearly includes a document – marked with a sticker denoting "Exhibit 1; Deponent: A. Eley; Date 1/19/11; Rptr. SJ" – which appears to be a "Resident Receivable

-8-

| Sat. 10/17/09: | At 7:22 a.m., Byford complains of swollen legs and testicles and requests to see Dr. Rupard. Nurse Delrio was called and advised of Byford's complaint and request and stated that she would call Dr. Rupard. |
|---|---|
| | At 9:38 p.m., Nurse Delrio is called three times due to being out of medications for four inmates, but with no answer to any of the calls. (Defs.' Respon. to Pl.'s SUMF ¶¶ 24(Q), 46-47.) |
| Sun. 10/19/09: | At 9:15 a.m., Off. Prince observs Byford laying on his back on the ground and advises over the radio that he had a man down. Byford is unresponsive and his breathing is very shallow and erratic, so Off. Prince advises Sgt. West to call for medical help and advise Capt. Lokey of the situation. Sgt. West calls 911 at 9:15 a.m. and then calls Nurse Delrio, both directly and at the jail, at 9:16 a.m., but there is no answer to either call. Sgt. Mullen advises Off. Garner to perform a sternum rub, which he does, but there is no response. Off. Prince retrieves the ammonia capsules out of the first aid kit and administers them, along with Off. Garner, to Byford. At 9:25 a.m., EMS arrives and begins CPR, and, at 9:35 a.m., transfers Byford by ambulance to the Bedford County Medical Center Emergency Room. Although Nurse Delrio calls back at 9:20 a.m., by the time she arrives at BCW at 9:49 a.m., the ambulance has already left with Byford for the hospital. Byford was then transported by Life Flight to Vanderbilt Hospital. |
| | According to the Vanderbilt Medical Death Summary: upon admission to Vanderbilt Medical Center on 10/19/09, Larry Byford was volume overloaded and in renal failure with a principle [sic] diagnosis of hypovolemic shock. Emergent hemodialysis was initiated. Shortly thereafter, he had generalized seizure like activity that spontaneously remitted. Shortly thereafter, dark red blood was suctioned from his OG tube. Bright red blood was then expelled from his mouth and his heart rate quickly declined. Cause of death was listed as GI bleed with a secondary diagnosis of renal failure and status post cardiac arrest. (Defs.' Respon. to Pl.'s SUMF ¶ 20) |

By October 4, 2009, during Byford's only visit to Dr. Rupard during his last period

of incarceration, Byford weighed fifteen pounds more than when Dr. Rupard had seen him

just one month before. Dr. Rupard ordered several measures to combat the swelling,

---

Report for Larry Byford for the time frame 01/01/2009 - 01/19/2011 and which reflects only two charges – one for a Doctor/dentist Call and one for Over The Counter Meds. – both of which charges are dated 10/16/2009.

including doubling his morning dose of Lasix (which had helped alleviate the excess fluid problem in the past), ordering him to elevate his feet, ordering his weight to be monitored by weighing every Monday, Wednesday, and Friday, and ordering that he return in 8 days to be rechecked. (Defs.' Respon. to Pl.'s SUMF ¶ 3.) According to the jail medication log, of the nineteen days he was incarcerated, Byford was given his Enulose – used in patients with chronic liver disease to prevent elevation of their ammonia levels – only 3 times (October 13, 16, 17); as to his Lasix prescription, he did not receive any of his Lasix nine of those days (October 1, 2, 7, 12-16, 18), only received one of the two daily doses on two other days (October 6 and 19), and Dr. Rupert's order to double the morning dose was not reflected at all. (*Id.* at ¶ 21.)

Finally, Defendant Delrio knew that Dr. Rupard had included in his orders the statement "I need to recheck in eight days at sick call" and that it was her responsibility to ensure Byford was brought to the jail for the follow-up appointment, but she consciously chose not to do so – that is, did not put him on the sick call list in eight days as ordered – because she said she thought he seemed fine – "[e]very time [she] went down [to BCW] to check on [Byford], he would be sitting up, he would be eating, he would be talking to me . . . [and h]e would say he was fine" – and because "depending on how long the list was, some patients got waited." (Pl.'s Respon. to Defs.' SUMF ¶ 120.)

There are many other undisputed facts in addition to those specifically tied to dates-certain listed above, but given the aforementioned difficulties with the parties' Statements of Undisputed and Material Facts, the Court will discuss those facts as needed in its analysis of the claims left in this action and disputed facts relevant to those claims.

-10-

## B.     Procedural History

On August 2, 2011, this Court issued a Memorandum and Order [Court Doc. 28] granting Defendants' Motion to Remand State Law Claims to State Court [Court Doc. 16] and granting in part and denying in part Defendants' Motion to Dismiss [Court Doc. 20]. As a result of this Order, all of Plaintiff's state law claims were remanded back to state court and Defendants Boyce and Lokey were dismissed entirely from the action, such that Plaintiff would proceed to trial only on her federal claims and "only against Defendant Delrio in her individual capacity as to the failure to provide medical care claim [Count One] and against Defendant Bedford County as to the bases for municipal liability asserted in Count Four." (*Id.* at 31.)

On August 15, 2011, the remaining defendants filed their Motion for Summary Judgment [Court Doc. 30], along with the Affidavit of Charles Lokey [Court Doc. 29] ("Lokey Aff."), several exhibits [Court Docs. 30-1 to 30-13], a Memorandum Submitted in Support of that motion [Court Doc. 31] ("Defs.' Mem. in Supp."), and their Statement of Undisputed and Material Facts [Court Doc. 32] ("Defs.' SUMF").

Plaintiff filed her Response in Opposition to Defendants' Motion for Summary Judgment [Court Doc. 35] ("Pl.'s Respon.") on September 6, 2011, along with several exhibits [Court Docs. 35-1 to 35-18], her Response to Defendants' Statement of Undisputed and Material Facts [Court Doc. 36] ("Pl.'s Respon. to Defs.' SUMF"), her own Statement of Material and Undisputed Facts [Court Doc. 37] ("Pl.'s SUMF"), and a Memorandum in Opposition to Defendants' motion [Court Doc. 38] ("Pl.'s Respon. Mem.").

Defendants objected to some of the material upon which Plaintiff relied in her response, which resulted in their filing, on September 13, 2011, two motions to strike: (1)

Defendants' Motion Strike Dr. Shackelford's Testimony and the Affidavits of Michael Throneberry and Allen Walsh [Court Doc. 40] ("Defs.' Mot. to Strike (Testimony)") – with a memorandum in support of that motion [Court Doc. 41] ("Defs.' Mem. re Striking Testimony") – and (2) Defendants' Motion to Strike Certain Responses to Defendants' Statement of Undisputed Facts [Court Doc. 42] ("Defs.' Mot. to Strike (SUMF)"), again with a memorandum in support [Court Doc. 43] ("Defs.' Mem. re Striking SUMF Respon."). On that same day – September 13, 2011, Defendants filed their Response to Plaintiff's Statement of Facts [Court Doc. 44] and their Reply Brief on their Motion for Summary Judgment [Court Doc. 45].

Finally, Plaintiff responded to Defendants' Motions to Strike, with her filing her Response to Defendants' Motion to Strike (Testimony) [Court Doc. 46], along with a memorandum in support [Court Doc. 47], on September 21, 2011, and her filing her Response to Defendants' Motion to Strike (SUMF) [Court Doc. 48], along with a memorandum in support [Court Doc. 49], on September 22, 2011.

III.   **ANALYSIS**

   A.   **Defendants' Motions to Strike**

   Unfortunately, Defendants' motions to strike are not clear about the precise ground upon which they are moving, and they make a mistake so common that the United States Court of Appeals for the Sixth Circuit has addressed this precise issue:

> Under Fed. R. Civ. P. 12(f), a court may strike only material that is contained in the pleadings. Fed. R. Civ. P. 7(a) defines pleadings as "a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is

-12-

summoned under the provisions of Rule 14; and a third-party answer, if a third-party complaint is served." Exhibits attached to a dispositive motion are not "pleadings" within the meaning of Fed. R. Civ. P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f).

*Fox v. Mich. State Police Dept.*, 173 F. App'x 372, 375 (6th Cir. 2006). In cases like this, the movants "should have, instead, challenged the affidavit's admissibility by filing a notice of objection to it." *See also*, S*utton v. U.S. Small Bus. Admin.*, 92 F. App'x 112, 118 (6th Cir. 2003) (finding "much support for this construction," although holding that the Court "need not resolve this dispute because plaintiffs suffered no prejudice from the district court's refusal to strike the affidavit under Rule 12(f).") In fact, a recent opinion of this Court in the case of *Cross v. Sbarro Am., Inc.*, 1:09-cv-275 discussed – and expressed its disapproval of – this very procedural error. *Cross v. Sbarro Am., Inc.*, 1:09-cv-275, Court Doc. 80, 7-8 (E.D. Tenn. Feb. 15, 2011) ("As a preliminary matter, the Court notes that the United States Court of Appeals for the Sixth Circuit has stated that Motions to Strike are only proper as a means to strike pleadings as outlined in Federal Rule of Civil Procedure 7(a)" and "the preferred method to challenge exhibits is by filing a notice of objection.")

But, in this case, even if the Court were to allow the motions to go forward construed as objections, it would still deny them. First, as to Defendants' Motion to Strike Certain Responses to Defendants' Statement of Undisputed Facts [Court Doc. 42], *Cross* again provides the necessary guidance. In that case, Plaintiff objected to Defendant's Statement of Undisputed facts as "not permitted under the Federal Rules of Civil Procedure or the Local Rules," and alleged that the Defendant was "us[ing] the document to impermissibly extend the page limit for its Motion for Summary Judgment by incorporating the lengthy (41

-13-

page) document into its brief." (*Id.* at 7.) As this Court noted there "while it is true that this Court has previously considered Statements of Undisputed Material Facts, which are not prohibited by the Rules, the Court now finds that such documents have limited value and they will not henceforth be considered in conjunction with a Motion for Summary Judgment ***in this case or any other***." (*Id.* at 8) (emphasis added).

In this case there are ***two*** Statements of Undisputed and Material Facts – each of which is similarly lengthy, with Defendants' [Court Doc. 32] being thirty-nine pages long and with Plaintiff's [Court Doc. 37] being thirty-four pages long – but in this case, the Court had the added burden of the responses – Plaintiff's Response [Court Doc. 36] being fifty-one pages long and Defendants' Response [Court Doc. 44] being thirty-seven pages long – and the instant Motion to Strike and its related briefing [Court Docs. 42-43 & 48-49], totaling forty-four pages in length. Even though this case is not like *Cross* insofar as the parties totally replaced the fact sections of their briefs with their factual statements incorporated by reference, they did use those responses to get into significant arguments over the relative merits of the statements, objections to their phrasing, and further argument over the facts of the case. At a minimum, as with *Cross*, "all of the facts outlined in the Statement are found in the documents and exhibits currently in the record, which the Court fully reviewed," the inclusion results in a "cumbersome process," and "the Statement--like many others the Court has seen--includes many facts that are very much in dispute, which renders the representation of the document as one that presents undisputed facts fairly useless to the Court." (*Cross* at 8, 9.)

Second, as to Defendants' Motion Strike Dr. Shackelford's Testimony and the

Affidavits of Michael Throneberry and Allen Walsh [Court Doc. 40], Defendants' arguments about Dr. Shackelford's opinions in particular, the Court would first note that the Scheduling Order [Court Doc. 5] for this case makes clear that "[i]f at any time it appears that a *Daubert* hearing may be necessary to determine the admissibility of expert testimony, the parties shall notify the Court at their earliest convenience of the potential need for such a hearing." It is difficult for this Court to believe that the earliest the parties knew about the alleged evidentiary weaknesses of this report was September 13, 2011, given that the report in question appears to be dated May 4, 2011 [Court Doc. 35-11, 2-3] and that the same Scheduling Order specifies that Plaintiff was required to make the disclosures required by Fed. R. Civ. P. 26(a)(2) by June 7, 2011. As this Court similarly held recently in another, very similar case, "[a]t this stage, without the benefit of a *Daubert* hearing to further explore the Defendant[s'] objections to [Dr. Shackelford] as an 'expert,' the Court is not prepared to grant the Defendants' motions to exclude [his] testimony." *Ramirez-Rosales v. Matheny, et al.*, 4:09-cv-109, Court Doc. 111, 15 (E.D. Tenn. Sept. 6, 2011) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). The Court believes final resolution of these arguments are better considered at the trial stage, pursuant to Defendants' motions *in limine* [Court Docs. 55, 56, 58, & 59], particularly given the lack of a *Daubert* hearing.

That being said, the Court has already considered most of Defendants' arguments, and believes it accounted for the evidentiary strengths and weakness of such attachments ably at the summary judgment stage. Unlike Defendants, the Court does not construe Dr. Shackelford's opinion as presenting himself as an expert on handwriting – and the Court

does not consider him one – and thus it does not give that opinion the weight Defendants fear. In addition, as to the Affidavits of Michael Throneberry and Allen Walsh, the Court is well aware that they are not physicians, and therefore considered only that evidence presented as known personally to the affiant.[7] Finally, and most importantly for Defendants' purposes, at a minimum, none of the evidence cited by Defendants is necessary to the Court's final finding that there are significant outstanding disputed issues of material fact.

Accordingly, Defendants' Motion Strike Dr. Shackelford's Testimony and the Affidavits of Michael Throneberry and Allen Walsh [Court Doc. 40] and Defendants' Motion to Strike Certain Responses to Defendants' Statement of Undisputed Facts [Court Doc. 42] will be **DENIED**.

### B. Defendants' Motion for Summary Judgment

As noted above, the only claims remaining in this action after the Court's August 2, 2011 Memorandum and Order [Court Doc. 28] are Plaintiff's federal claims against Defendant Delrio in her individual capacity[8] as to the failure to provide medical care claim and against Defendant Bedford County under theories of municipal liability for the underlying constitutional deprivation.

---

[7] The Court does note, however, that most of Defendants' objections to the inmates' affidavits, both those based on relevance and on hearsay objections, are not necessarily well-taken. For instance, Defendants state "Throneberry fails to dispute whether Officer Prince believed that Mr. Byford had trouble walking . . . Mr. Throneberry reaches a different opinion regarding Mr. Byford [*sic*] ability to walk. Not only does this fail to dispute Mr. Prince's opinion, it also fails to provide a scope in time when Mr. Throneberry claims he assisted Mr. Byford." (Defs.' Mem. re Striking Testimony 10.) It might not "dispute" Mr. Prince's opinion, but it does undermine its credibility, a dispute very much reserved for the jury, particularly in light of other pieces of evidence as to the same point.

[8] Defendants make only three, very cursory references to Defendant Delrio's (potential) entitlement to qualified immunity and collapse those references into their substantive argument on the subjective component of the deliberate indifference standard. While this may be somewhat unavoidable in the context of claims for deliberate indifference to medical needs, regardless it has not been addressed in any depth here, and so the Court, like the parties, will focus on analysis of the evidence on that subjective component.

-16-

To succeed on her failure to provide medical treatment claim under the Eighth Amendment, Plaintiff must prove that Defendants acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Proving that Nurse Delrio was "negligent in diagnosing or treating a medical condition" is insufficient to show a violation of Byford's Eighth Amendment rights; "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106 (holding that, to succeed on an Eighth Amendment claim, "a prisoner must [prove] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment.")

Plaintiff's constitutional claim for deliberate indifference to serious medical needs has "both an objective and a subjective component." *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009). The objective component requires Plaintiff to assert facts showing "the existence of a 'sufficiently serious' medical need," *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). As Defendants do not dispute that Byford had a sufficiently serious medical need, the only matter left for the Court to determine is whether there are genuine issues of material fact relevant to the subjective component – that is, a dispute as to the "facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that [s]he did in fact draw the inference, and that [s]he then disregarded that risk." (Defs.' Mem. in Supp. 13); *Dominguez*, 555 F.3d at 550 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). Finally, while disputes as to the actions a medical official should have

-17-

taken do not always amount to a constitutional violation, the mere fact that an official did respond in some manner likewise does not automatically immunize them from allegations of such a violation. An official's delay in responding to reports of serious symptoms – such as the situation in *Dominguez*, where the defendant nurse informed an ill inmate that "despite his serious symptoms she would not see him until her regularly scheduled medication run" – or the official's performing a cursory evaluation and taking little followup action in the face of serious symptoms can both constitute deliberate indifference. *Dominguez*, 555 F.3d at 551 (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844 ("[A] prison employee's two-hour delay in providing medical care to an inmate known to have a serious condition may constitute deliberate indifference") & 843 ("[W]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.") (6th Cir. 2002)).

In *Dominguez*, the Sixth Circuit also acknowledged special issues of proof facing a plaintiff as to the subjective component, noting that "[b]ecause government officials do not readily admit the subjective component of this test, it may be 'demonstrat[ed] in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Dominguez*, 555 F.3d at 550 (quoting *Terrance*, 286 F.3d at 843).

In this case, Defendant largely relies on the depositions of its employees – Nurse Delrio in particular – and then attempts to undermine Plaintiff's responsive evidence grounded in the written records provided by Bedford County using those same depositions. The circumstances surrounding Byford's admission to Medical Watch are a typical example. Defendant Delrio represented she was called early on October 5th, 2009,

-18-

probably about 4 or 5 a.m. and informed that Byford had some swelling in his face, and she responded by directing the guards to move Byford to medical watch. (Defs.' SUMF ¶¶ 39-41.) Plaintiff responded by noting that the (contemporaneously-prepared) Jail Shift Report indicate that Byford was not moved to Medical Watch until October 8 at 2:27 a.m., after Dorm-H reported that Byford was coughing and could not sleep. (Pl.'s Respon. to Defs.' SUMF ¶ 10.) Those same records also indicate that Nurse Delrio was called at 6:22 a.m. that same day (October 8) about Byford, to which she responded that she would be in at 8:00 or 9:00 a.m. to check on him. (Court Doc. 35-6, Part 3 of the Exs. to the Lokey Dep., #928-29.) She did not actually check on him until around 11:48 a.m., and that was after Byford had already vomited in his cell, and she had been called about his condition yet again. (*Id.*) Even so, despite her statement in the second phone call that she will be down there "in a few," she still took almost an hour to leave the jail for BCW. (*Id.*)

While this discrepancy may seem minor, as already noted, similar discrepancies appear repeatedly throughout the disputes over Nurse Delrio's accounts of her understanding of Byford's condition and her responses to the same. In direct contrast to her statement that she visited him often during dinner and he was eating normally, Plaintiff offers not only the Affidavit of Allen Walsh, in which Mr. Walsh says that he "regularly removed [Byford's] food and observed that he rarely ever ate any of his food," but also the October 13 note from Sgt. Arnold to Capt. Lokey saying "[h]e doesn't seem to be eating much." (Arnold Note.) Although Defendants attempted to explain away the circumstances surrounding Arnold's note by offering testimony elicited at his deposition – that he "wrote it out of frustration," "had never dealt with an inmate defecating on himself before and this experience stressed him out," and "did not agree with how the nurse was treating Byford's

diarrhea because he was still having problems with diarrhea" – a factfinder could easily (and legitimately), find a contemporaneous, written account by an official personally involved with Byford's care very persuasive, especially where supported by the testimony of inmates who saw Byford daily, and correspondingly disbelieve Delrio's statement that he was eating normally. (Defs.' SUMF ¶¶ 75-77.)

These issues alone – whether she ordered the treatment she did, when she saw Byford, how he appeared – are the very heart of the matters at issue in this case, and the credibility of Defendant Delrio's testimony on those issues are crucial to the determination of this claim. Such credibility is a matter reserved to the factfinder, particularly where, as here, there is substantial evidence – ranging from the medication logs, to the testimony of other witnesses, to the Jail Shift Reports – contradicting many of her statements in details both large and small.[9] Therefore, at this stage of the proceedings, summary judgment is simply not appropriate on Plaintiff's claim against Nurse Delrio.

Issues are also similarly disputed with respect to the County's liability and likewise preclude a grant of summary judgment. "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or

---

[9] Similar disputes exist on a number of material facts, including Defendant Delrio's actual schedule (including her official schedule, her actual visits to the jail and BCW, her ability to be reached while "on-call," and her visits to Byford), Byford's medications (Delrio's understanding of their function, her directions to staff, whether those directions were followed, etc.), Byford's observable symptoms, Delrio's reaction to her in-person meetings with Byford (what she ordered, how she responded – or didn't – to Byford's requests and the officers' reports, etc.), and Delrio's understanding and performance – or lack thereof – of Dr. Rupard's orders (weighing Byford, Rupard's order to have Byford return, etc.) (*See generally*, Pls.' Respon. to Defs.' SUMF ¶¶ 9-10, 19, 29, 41-42, 45, 55, 68, 112, 118, 131-33, 140.)

supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Further, "[t]o show deliberate indifference [as to the various supervisory claims], Plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury," *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (citing *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Alternatively, "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

Defendants have clearly rebutted Plaintiff's claim in her Complaint that the County had *no* policy regarding the provision of medical treatment to ill prisoners, but genuine issues of material fact remain as to the nature and adequacy of the County's policies, the County's customs, and the County's supervision, both of Nurse Delrio and of the officers implementing her instructions. As with the claim against Delrio in her individual capacity, the Court highlights only a few of the several issues remaining below.

Both Plaintiff and her mother, now deceased, talked to Byford by telephone throughout his incarceration, and on October 15 and 16, he complained of passing blood rectally and said that he was "still real weak [ ] and swollen." (*Id.* at ¶¶ 6-9, 14-16.) Further, Plaintiff repeatedly called Nurse Delrio during Byford's incarceration, and during at least two of those calls – one in the morning of October 15 and the other that afternoon – Delrio

told Plaintiff that she had not yet been to BCW, but that she would, before hanging up on Plaintiff. (*Id.* at ¶¶ 10-13.) As alleged in Plaintiff's deposition alone, Defendants – not just Nurse Delrio, but several of the BCW officials, including Capt. Lokey, the official in charge at BCW – were repeatedly put on notice that Byford's condition was worsening but not only explicitly ignored her – in the case of Defendant Delrio hanging up on her – but actively prevented Plaintiff from seeing him. Likewise, and similarly to the situation in *Dominguez*, there are repeated examples of BCW officials expressing concern about Byford and calling Defendant Delrio, and Delrio either not appearing to take it seriously, saying she would visit the jail later and not doing so or doing so several hours later.

Defendants listed Nurse Delrio as being on call 24 hours a day, and yet during the short period implicated in this case, she repeatedly did not answer her phone. BCW officials could not even leave messages, as her phone did not have working voicemail, a circumstance of which jail officials should have been aware, but of which she notified her superiors. Therefore the degree to which she was actually accessible is disputed and relevant to the County's policies and customs, both as to the sufficiency of the County's policies and customs and how they were actually carried out in practice.

Further, even though the County routinely deals with inmates like Byford, suffering serious medical conditions that require administration of medication, Nurse Delrio stated that during her entire six years with the Bedford County jail, guards had a problem of not initialing the medication charts when they administered medications (Pl.'s Respon. to Defs.' SUMF ¶ 125.) Defendants attempt to minimize the seriousness of this issue by relying on her testimony that she did not think that necessarily meant Byford was not getting those medications, just that they were not recorded as being administered, but it is not clear to

-22-

the Court that this is much better. Even accepting that explanation, the County is saying that the record-keeping as to administering medications – which obviously has life-threatening implications in many situations, including in Byford's case, allegedly, from duplicating the administration of medications, failing to ensure medications are administered, etc. – has been consistently very poor for six years.

Finally, although the County has attached copies of the relevant policies and Capt. Lokey testified at length about his role in compliance, there is also evidence that they are not distributed or administered in accordance with their own provisions or his testimony, based upon the testimony of Off. Eley, Off. Jeff West, and Off. Mangrum. (*See, e.g.*, Pl.'s SUMF ¶¶ 69-71.)

The circumstances noted in the Court's previous Order remain the subjects of disputed material facts, and thus summary judgment is not appropriate at this time as to Plaintiff's claims against the County.

Accordingly, Defendants' Motion for Summary Judgment [Court Doc. 30] will be **DENIED**.

## IV.    CONCLUSION

Accordingly, and for the reasons stated herein, Defendants' Motion for Summary Judgment [Court Doc. 30]; Motion Strike Dr. Shackelford's Testimony and the Affidavits of Michael Throneberry and Allen Walsh [Court Doc. 40]; and Motion to Strike Certain Responses to Defendants' Statement of Undisputed Facts [Court Doc. 42] are hereby **DENIED**.

-23-

**SO ORDERED** this 20th day of October, 2011.

_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE

-24-